UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| NICHOLAS GRAY, On Behalf Himself and Others Similarly Situated, | * | |
| Plaintiff, | * | |
| vs. | * | C.A. No. 4:08-cv-3369 |
| PASHA ENTERTAINMENT GROUP, LLC AND MICHAEL WARREN POWERS, | * | |
| Defendants. | * | |

*****************************************************

ORAL DEPOSITION OF

MICHAEL WARREN POWERS

JUNE 13, 2009

*****************************************************

ORAL DEPOSITION OF MICHAEL WARREN POWERS, produced as a witness at the instance of Plaintiff, and duly sworn, was taken in the above-styled and numbered cause on the 13th day of June, 2009, from 10:35 a.m. to 12:55 p.m., before Suzanne Jeansonne, CSR in and for the State of Texas, reported by shorthand machine, in the offices of Bruckner Burch, PLLC, 1415 Louisiana Street, Suite 2125, Houston, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.



**Exhibit 2**

7223ce04-14c0-46e5-84c1-5b4d5b5a864e

Michael Powers?
    A. Yes, I am.
    Q. Were you affiliated in any way with Pasha Entertainment Group?
    A. Yes, I was.
    Q. What was your affiliation with Pasha Entertainment Group?
    A. I was an officer of Pasha Entertainment Group, L.L.C.
    Q. How long were you an officer of Pasha Entertainment Group?
    A. From formation until the end. I don't remember the formation date. The end was last August or September.
    Q. Who formed Pasha Entertainment Group?
    A. Five people.
    Q. Who are those five people?
    A. Myself, Stephen Powers, Kathleen Powers, Richard Stark and Christian Bruckner.
    Q. What was the impetus for doing that?
    A. To start a nightclub.
    Q. Okay. You and four others wanted to start a nightclub; is that right?
    A. Correct.
    Q. Are you in the nightclub business generally?
    A. No. Someone came to me -- one of those officers came to me as an investment opportunity. It was something

A. That's correct.
Q. Tell me all the reasons why.
A. You'd have to ask questions that I'd have to give answers to. I can't, you know --
Q. That is my question. My question is: Tell me all the reasons why you think you're not liable.
A. Well, one, I was not an -- I was not -- well, we'll keep it simple.
Q. Okay.
A. I was not indirectly nor directly involved in the running of that club once it was opened.
Q. Okay. What else?
A. That says it all. Once it opened, I stepped away. I had nothing to do with the place. I never went there but maybe five or six times in seven months -- or 17 months that it was open. Wasn't responsible for staffing. We contracted a general manager that did everything. I literally had about as little to do with the place as possible. I facilitated the buildout, and then I was done.
Q. Tell me what "facilitated the buildout" means.
A. I was there every day building stuff, you know, going to Home Depot, building a waterfall, you know, hiring electricians, hiring plumbers.
Q. Okay. So -- and that's prior to the club opening, I guess.

A. Correct.
Q. And you say "we" contracted out the management. Who did that?
A. The officers of the club.
Q. Okay. So you and the other four officers?
A. Correct.
Q. And who did you contract out the management to?
A. The first contract manager was Julian Richie. The second was Nick Gray.
Q. Who was Julian Richie?
A. The first contract manager.
Q. I understand, but who is he to you?
A. Someone that was introduced to me by another partner or officer, whatever you want to call it.
Q. Okay. So Julian Richie is brought to you. You interviewed him, said, "Okay, you're contract manager." Right?
A. Julian Richie was brought to all the officers.
Q. Sure.
A. And all the officers made a decision to hire him --
Q. Collectively.
A. -- because he had -- right. He had 20 years in the Houston club business.
Q. Okay. Why did Julian Richie leave Pasha?
A. He was too expensive. The club wasn't making money.

Q. Okay. So --
A. He was terminated.
Q. By whom?
A. By the officers of the club.
Q. Okay. So you-all got together, took a vote, said, "Julian, you're too expensive, you gotta go"?
A. Correct.
Q. I think you told me that Pasha Entertainment Group was an investment opportunity for you. Is that right?
A. Yes.
Q. I'm guessing that means you put up some of the money to get Pasha group off the ground.
A. Yes. We all did.
Q. Okay. What percentage of the money to get Pasha group came from you?
A. I don't know.
Q. Okay. How much did you put up?
A. I don't know. It got out of control, and I just -- I didn't want to know. The other officer, my sister-in-law, Kathleen Powers, kept the books. I would just give her the receipts over a six-month period.
Q. Over what six-month period?
A. How long -- the buildout. That's how long it took the buildout in the club.
Q. So you made an investment into Pasha group, but you



7223ce04-14c0-46e5-84c1-5b4d5b5a864e

have no idea how much you invested into it?
A. Not exact dollar, no.
Q. Okay. How about ball park?
A. Over a hundred.
Q. Over a hundred thousand dollars?
A. (No response).
Q. Who are the other officers in relation to you? I know one is your sister-in-law. One, I guess, is your brother; is that right?
A. That's correct.
Q. Who are the other two?
A. Richard Stark is a mechanic that I use at my real business.
Q. Uh-huh.
A. And then he was friends with Christian Bruckner.
Q. Okay.
A. And they had the club leased, and they ran out of money. And then Richard Stark has known me for years because he does work at my business --
Q. Uh-huh.
A. -- and he came to me.
Q. Okay. So Bruckner and Stark were essentially out of money, and they needed financial backing; is that right?
A. They weren't all the way out, but they couldn't finish the project.



7223ce04-14c0-46e5-84c1-5b4d5b5a864e

Q. Okay.
A. They needed help finishing the project.
Q. Okay. So the club had not even opened by the point that they were -- by the point they came to you; is that right?
A. No. They were -- had started the buildout and were looking for other partners to help them finish.
Q. Okay. So just so I'm clear, the club had not opened by the time they came to you and said, "We need some money." Right?
A. That's correct.
Q. Okay. Is your brother a wealthy man, in your opinion?
A. I'm not a wealthy man, in my opinion.
Q. Okay.
A. I mean, that's pretty relative, you know.
Q. Uh-huh.
A. I mean, to me, wealthy is $10 million.
Q. Me, too.
A. To some people, wealthy is a hundred thousand dollars. So in my opinion, no, none of us are wealthy.
Q. Okay. I guess what I'm getting at is: Is it more likely that most of the money came from you or from your brother?
A. He put in a substantial portion; but, yes, I did --

I put in more money than him, yes.
Q. Okay. And is that true of the other officers, as well, you probably put in the most money?
A. Yes.
Q. How long had they been working on the buildout before they came to you?
A. I don't know. A couple of months, maybe.
Q. And then it took another six months to finish that work?
A. Yes.
Q. And you were assisting in that or coordinating that. What was your role in doing that?
A. I mean, I used my contacts to hire electricians, got the bids, made sure the work got done and then did, you know, a lower -- some of it myself --
Q. Uh-huh.
A. -- you know, to save money.
Q. Uh-huh. Is that something that you're familiar with? Do you hire contractors regularly in your -- what I think you call your real business?
A. No.
Q. Okay. How do you know those folks?
A. Oh, like Kathleen Powers, another officer, her brother is a general contractor in this city.
Q. Uh-huh.



7223ce04-14c0-46e5-84c1-5b4d5b5a864e

A. Yes.
Q. Okay. When did Pasha group -- Pasha Entertainment Group, excuse me, cease to exist, in your opinion?
A. Either the last week of August or first week of September. I can't remember.
Q. And is that 2008?
A. Yes.
Q. Who was responsible for getting the liquor license for Pasha?
A. Christian Bruckner.
Q. Whose name is on the liquor license?
A. The first year of operation was Christian Bruckner. The second year was my name.
Q. Why did that change?
A. Liability.
Q. You wanted more, he wanted less?
A. He wasn't responsible.
Q. Okay. We're going to talk about that in a minute, because I notice there was some directive given to Mr. Gray not to turn over certain information to Christian.
A. (Nodding head).
Q. Were there any other licenses that the club had to have to operate other than a liquor license?
A. Permits from the city, standard permits. No other licenses that I know of.

Q. Did you have to have a fire code inspection?
A. Yes.
Q. Did you have to have a certificate from the city that you were in compliance with zoning restrictions?
A. I don't know.
Q. Okay. Who handled getting the permits for the Pasha nightclub?
A. Kathleen Powers and Julian Richie.
Q. Do you know what the Fair Labor Standards Act is?
A. I'm not sure. Do I know what it means? I'd never heard of it until this, and I know the one sentence that -- that is -- you know, that's indirectly or directly operating, you know. But, no, I'm not -- have a great depth of knowledge of FLSA, no.
Q. Okay. Had you heard of the FLSA prior to this lawsuit?
A. No.
Q. Do you know what the minimum wage is?
A. Yes.
Q. What's the minimum wage?
A. Oh, now? Oh, 6 or 7 -- I don't know what it is now.
Q. Okay. You're aware that there is a minimum wage law?
A. Yes, I know that. I know there is a minimum wage, yes.



7223ce04-14c0-46e5-84c1-5b4d5b5a864e

Q. Okay. So that's what they were planning to call the club before you got there?
A. That's correct.
Q. Okay. Why did you-all create an L.L.C.?
A. That's what you do when you start a business.
Q. Okay. Why?
A. Personal liability.
Q. And so forming an L.L.C. helps you avoid personal liability for the debts of the company; is that right?
A. So I'm told.
Q. Okay. That works a lot better outside the Fair Labor Standards Act context. I understand what you're saying. We're an L.L.C. We're a P.L.L.C.
A. Everybody is.
Q. Right. Okay.
At the time you-all were doing the buildout, had you already contracted with Julian Richie?
A. During the buildout phase he was contracted, probably two or three months before opening.
Q. Did he have a contract?
A. Yes, he did.
Q. Do you have a copy of that contract?
A. I don't know. Maybe. Stephen or Kathleen would have it.
Q. How did Steve and Kathleen come to be involved if

they're not here in town?
A. I asked them if they wanted to be involved.
Q. Okay. So Mr. Stark and Mr. -- is it Bruckner?
A. Yes.
Q. Yeah, came to you and said, "We're looking for an investor." You said, "I'll think about it." Or had you already decided to invest before you went to your brother and sister-in-law?
A. No. I said, "I'll think about it."
Q. Okay.
A. Asked them if they wanted to do it with me.
Q. Okay. They said yes. Right?
A. Correct.
Q. And then you-all all invested together. Right?
A. Correct.
Q. What was Mr. Stark's role in operating the company?
A. He was a contractor for the buildout.
Q. Did he handle the money once the place was open?
A. No.
Q. How about Mr. Bruckner?
A. No.
Q. Did he receive the financial reports as to how you-all were doing as the nightclub went along?
A. No. There weren't any financial reports as the nightclub went along.


7223ce04-14c0-46e5-84c1-5b4d5b5a864e

Q. Well, let's talk about that for a second. Will you go to the attachment? It's page -- if you're looking up at the very top, it's page 8 of 11.
A. (Complying).
Q. Now, as I understand it, this is a contractor agreement between Nick Gray and Pasha Entertainment Group. Is that right?
A. That's correct.
Q. I notice in some places it's spelled P-A-S-H-A-A, and sometimes there's one A. Do you know which is correct?
A. The A, single A, is how it was filed with the L.L.C.
Q. Uh-huh.
A. All the -- I think all the brochures -- or not brochures but, like, business cards had two A's.
Q. Okay. Is that intentional, or you don't know?
A. I don't know.
Q. Okay. Let's go down -- are you on that document?
A. Yes.
Q. Let's go down to No. 8. It says "Communication with Officers." Right?
A. That's correct.
Q. And it says, "Text nightly numbers to Stephen and Michael." Do you see that?
A. That's correct.
Q. Who are Stephen and Michael?

A. My brother and myself.
Q. Fair enough. What are the nightly numbers?
A. Sales, gross sales.
Q. Did Julian Richie have a similar clause in his contract?
A. I don't know. I'm sure he did. He texted numbers to Stephen because Kathleen kept the books. She kept the checkbook. So the manager always texted them the numbers so she could keep up with the money.
Q. Okay. Here, it says text the numbers to Stephen and Michael. Do you see that?
A. Yes, that's what it says.
Q. Okay. So under the contract between Nick Gray and Pasha Entertainment Group, you were supposed to get nightly numbers. Right?
A. I was supposed to.
Q. Of the gross sales of Pasha. Right?
A. Correct.
Q. And that would be so you could monitor the financial performance of Pasha. Right?
A. So I could see what's happening, yes.
Q. And that --
A. It didn't always happen, though. I did not always get the text.
Q. That's fair enough. But, I mean, you made a large



7223ce04-14c0-46e5-84c1-5b4d5b5a864e

A. Yes.
Q. And that was built into the club. Right? It's not -- they didn't wheel in a different sound system every night for the different deejays. Right?
A. No. It was on his booth there.
Q. Who owned that sound system?
A. Some of it was owned by Pasha Entertainment Group, and then some of it, deejays brought in their own stuff.
Q. Okay. How about the jockey boxes, who owned that?
A. Pasha Entertainment Group.
Q. How about the glasses, the liquor, stuff like that, who owned that?
A. Pasha Entertainment Group.
Q. Was there anything inside Pasha, any fixture, any equipment, any tools that was not owned by Pasha?
A. Yes.
Q. What was that?
A. I think they rented speakers.
Q. Do you-all have a velvet rope or anything out front of Pasha?
A. They had some ropes, I think.
Q. Okay. Who owned those?
A. Pasha Entertainment Group.
Q. Did you-all have any little carts or anything like that to push drinks around?

A. Not that I know of.
Q. Did you-all have an ice machine?
A. Yes.
Q. Who owned that?
A. Pasha Entertainment Group.
Q. Did you-all have a blender or anything like that for making frozen drinks?
A. Not that I know of.
Q. What kind of nightclub was Pasha?
A. It was different all the time. The managers hired promoters, and they brought their crowd in.
Q. So there was no consistent theme in terms of the type of music they played or the type of crowd that you had?
A. No.
Q. Was it private parties every night, or what kind of --
A. No, I don't think -- no, I don't think they ever did private parties. They might have. I don't know.
Q. What kind of business volume, gross business volume, did Pasha do?
A. I don't know.
Q. Ball park?
A. It varied from month to month. They had a couple of good months, and then other months were really bad.



7223ce04-14c0-46e5-84c1-5b4d5b5a864e

A. There's not -- there's not a set thing.
Q. Okay. Does he own his own business?
A. Yes.
Q. What kind of business does he own?
A. He's a patent agent.
Q. How many employees does he have?
A. That's a side business for him.
Q. Okay. So he owns a business sort of on the side, and then he has a job?
A. Him and a patent attorney have a partnership in a patent -- an intellectual property group.
Q. Right. Okay.
A. That's his business experience.
Q. Okay. What's his job?
A. He works for Agilent Technologies.
Q. And what do they do?
A. Environmental testing equipment.
Q. You see at the bottom, No. -- on page 8 there, it says, No. 11, "Do not distribute keys to club to anyone."
A. Yes.
Q. Did you have keys to the Pasha Entertainment Group's club?
A. Yes, I did.
Q. Who else had keys?
A. The contract managers.

Q. Okay. What about the other officers?
A. The other officers, they had sets, too.
Q. Okay. So in terms of keys to the club, it's you, the other four officers and the manager. Right?
A. At the beginning, yes.
Q. Did that ever change?
A. Yes.
Q. Who changed it?
A. The officers did.
Q. How did they change it?
A. One officer was removed from the corporation, so the locks were changed.
Q. Okay. Is that Mr. Bruckner?
A. That's correct.
Q. Okay. How did you-all remove Mr. Bruckner?
A. Kathleen called him, I think.
Q. Fair enough. But how did you formally remove him from the L.L.C.?
A. They handled that.
Q. Okay. Why did you-all remove him?
A. Because he was a liability.
Q. What was his liability?
A. He wasn't contributing. He was damaging the club. He was not doing anything beneficial for the betterment of the L.L.C.

A. Well, he had disappeared --
Q. Uh-huh.
A. -- was doing these things, acting crazy; so Steve contacted him and said, "You're out of here."
Q. And what had he done that made you feel like he should be thrown out of the L.L.C.?
A. He didn't do what he was supposed to do.
Q. Which was what?
A. He was supposed to be in charge of advertising and promotions.
Q. Who took over advertising and promotions after he was kicked out?
A. Julian Richie. He handled it from the beginning.
Q. Okay. So was Mr. Bruckner kicked out pretty early on?
A. Yes.
Q. Was he kicked out before the club opened?
A. No.
Q. I guess he couldn't be if he was complaining about the service.
Mr. Bruckner was supposed to be in charge of advertising and promotions. Were there other duties that were assigned to the various officers?
A. I was in charge of the buildout. Steve and Kathleen were in charge of keeping the books.



7223ce04-14c0-46e5-84c1-5b4d5b5a864e

A. The officers, yes, we terminated his contract.
Q. And did fire him. Right?
A. Correct.
Q. But some rank and file employee --
A. They weren't employees.
Q. Contractor, whatever --
A. Julian contracted these people.
Q. Okay. Whatever you want to call them. Somebody working in Pasha, right, as a bartender, barback, whatever, all right, you feel like you're powerless to stop that person. Right?
A. I didn't have -- I never went there, didn't have anything to do with the place. I went five times in 17 months, so --
Q. No. No. And I hear you.
A. I mean, I know what scenario you're trying to create, but I'm telling you, he handled the employees. He would have handled discipline. He would have done that stuff, both him and Nick. They had complete authority.
Q. Sure. And that's fine, because they got that authority from you.
A. Correct.
Q. Right. So I guess my question is: Seems to me that if you've given authority to somebody, right, a manager, who you have the authority to remove, if you go to that



7223ce04-14c0-46e5-84c1-5b4d5b5a864e

manager and you say this employee, contractor, whatever you want to call them, this barback is not doing what I want to see done, that person's going to get the ax. Does that seem logical to you?

A. No.

Q. Okay.

A. Because I don't --

Q. That's fair.

A. I never defined those employees' or contractors' duties. So you're saying they're not seeing what I want done. I don't know what they're supposed to be doing.

Q. Okay. They're probably not supposed to be spitting in your face. Right?

A. That's -- yes, I'm sure. Nobody's supposed to spit in anybody's face.

Q. Okay. Probably not supposed to insult your wife. Right?

A. That's not a good thing, either.

Q. Right. Tell me why you went to the club the few times that you went.

A. Friends wanted to go, get V.I.P. treatment.

Q. Uh-huh.

A. So I kind of had to.

Q. Uh-huh. Why would you get V.I.P. treatment?

A. Because I was an officer.



7223ce04-14c0-46e5-84c1-5b4d5b5a864e

Q. Okay. Did you have little V.I.P. cards at Pasha?
A. Not that I know of.
Q. Did you call ahead and say, "Hey, by the way, I'm coming in"?
A. No.
Q. When you got there, who did you tell, "Look, I want to be given the V.I.P. treatment"?
A. I mean -- by V.I.P. treatment is I didn't have to pay cover, stand in line.
Q. Sure.
A. And if I didn't want to, I didn't have to pay for a drink.
Q. Sure. No, I'm -- that sounds like V.I.P. treatment.
A. They didn't have a special section -- I mean, I went there five or six times in 17 months.
Q. Right.
A. I didn't have a special section or a special card or --
Q. Hey, I'm -- look, if I had invested the kind of money you invested in a nightclub, I would expect that kind of treatment. Believe that.
A. Most of the people didn't know who I was.
Q. So, I mean, what I want to know is how they know to treat you like I would expect to be treated.
A. Julian would tell them, "Hey, that's one of the

officers."

Q. Okay.

A. Or Nick, depending on who was there.

Q. Uh-huh. Was there a door person at Pasha?

A. Yes.

Q. And did that person -- was that their job, to watch the door?

A. Correct.

Q. Okay. Then there's at least two bartenders; is that right?

A. I mean, there was bartenders there, at least two.

Q. The times that you were there, there were at least two bartenders?

A. Yes.

Q. Were there waitresses? Were there -- did you have to go to the bar to get a drink?

A. There was one waitress.

Q. One waitress for the whole club?

A. Uh-huh.

Q. Is that "yes"?

A. Yes.

Q. Barbacks?

A. Yes.

Q. How many?

A. I don't know.

effort to make sure that they were getting paid overtime if they worked more than 40?
A. Well, for one, I know they were all making more than minimum wage just -- you know, I know what bartenders make.
Q. Uh-huh.
A. So, I mean -- and I didn't have any other -- you know, that's just common sense. I know they're not making 5 bucks an hour tending bar.
Q. And why is that?
A. Because the bartenders would tell me when I was there how much money they made.
Q. Were they making that money in wages or were they making it in tips?
A. Tips.
Q. Okay. What are the requirements for counting tips as wages under the Fair Labor Standards Act?
A. I don't know.
Q. Okay. Are you aware that you can't treat tips as satisfying the full minimum wage?
A. I'm not familiar with the FLSA.
Q. Okay. So you're not aware that you can't treat tips as satisfying the full minimum wage?
A. No, I'm not aware.
Q. Okay. Are you aware of any wages that were paid to anybody other than Nick Gray and Julian Richie?

A. I didn't handle the checkbook. I don't know.
Q. And you didn't bother to look at it, either. Right?
A. No.
Q. Did you have the power to look at the records of Pasha group if you wanted to?
A. I suppose so.
Q. When did you first learn that Pasha wasn't going to be profitable?
A. The second week.
Q. And how long after that did Pasha continue?
A. Seventeen months.
Q. Did you ever have to give any money to Pasha to keep it running?
A. Maybe the first month. Then after that, it was on its own.
Q. Uh-huh.
A. And I said if it fails, it's over with, because I was -- didn't want to be a part of it.
Q. Who explained to Julian Richie and Nick Gray that they needed to comply with the federal wage and hour laws?
A. Nobody that I'm aware of. They were experienced managers that knew, you know, like I said, all the -- all the responsibilities that came with managing a bar: employment, liquor license, city permits, all that stuff.
Q. Okay. Tell me what Julian Richie knows about the

A. It was a three-year lease. I don't know the exact date.
Q. How did Pasha get out of the lease?
A. We just vacated the building, called the landlord. We left.
Q. Okay. Did you-all have any personal guarantees on the lease?
A. There was a personal guarantee by Christian Bruckner.
Q. Not you, though?
A. No.
Q. And so --
A. He signed the lease originally.
Q. Right.
A. The lease was already in place when I got there.
Q. Okay. So you were not -- Pasha Entertainment Group got the lease from Mr. Bruckner?
A. No. We got the lease from the landlord.
Q. Sure.
A. But the personal guarantor was Christian Bruckner.
Q. Okay. Let me -- which came first? Was the lease obtained, or was Pasha Entertainment Group formed?
A. The lease was obtained.
Q. Okay. So how did Pasha Entertainment Group come to have the lease?
A. They switched -- the landlord switched the name on

the lease.
Q. Okay. From what to what?
A. From Christian Bruckner personally to Pasha, L.L.C.
Q. Okay. And because he had held the lease personally, the landlord said, "You're going to stay on personally, and we'll add Pasha group." Right?
A. I think it just says Pasha, L.L.C. It doesn't say Pasha and him. But, like I said, the personal guarantee section was him.
Q. Okay. He gave a personal guarantee one way or another. Right?
A. Yeah.
Q. Do you know whether any litigation has resulted from you --
A. No.
Q. Following -- was there anybody higher on the food chain at Pasha Entertainment Group than you?
A. We were all equals. Like I said, no titles. It was just -- started off as five, got to three people making an investment.
Q. Okay. So there may have been people that were equal to you --
A. We're all equals.
Q. Right.
A. We're all members.

Q. And when you go to a nightclub and there are bars, you expect them to have bartenders. Right?
A. That's correct.
Q. That's an integral part of having a nightclub is having a bartender. Right?
A. They serve the drinks.
Q. So that's an integral part of having a bar. Right?
A. Yes.
Q. Having bartenders. Yes?
A. Yes.
Q. Probably should have a waitress, too, if you have more than just a one-room thing with a bar in it. Right?
A. I've been to plenty of clubs without waitresses.
Q. Okay. Similar to Pasha?
A. It was college days. I don't -- you know.
Q. Okay.
A. All clubs are the same to me.
Q. What was the cover charge at Pasha?
A. I don't know.
Q. Was there a cover charge?
A. I don't know.
Q. You told me earlier, "I don't have to pay the cover charge because I'm one of the members."
A. Yeah.
Q. Right?



7223ce04-14c0-46e5-84c1-5b4d5b5a864e

and found people to work at Pasha?
A. He had a lot of people with him that were ready to come work for him.
Q. Uh-huh.
A. So, I mean, he staffed the place, and he knew people.
Q. How about Nick Gray, was the bar already operating when Nick Gray became the manager?
A. Yes.
Q. And did it already have employees there at the time he became the manager?
A. There were people there, yes.
Q. And so Julian Richie left, and Nick Gray came in to the same position. Right?
A. That's correct.
Q. Was there a mass exodus of people, like did the bartenders all leave, did the waitresses leave, or did they stay the same?
A. I don't know.
Q. Okay. So if Nick Gray says they stayed the same, people were already there, you don't have any evidence to contradict that. Right?
A. I mean, I'm sure some stayed and then some -- you know, I don't know.
Q. Do you have any evidence that Pasha Entertainment Group paid either Christi or -- well, let me ask you this:

Do you have any evidence that Pasha ever paid Christi L. Fisher any wages?

A. No.

Q. Do you have any evidence that Pasha paid Jessica Nichols any wages?

A. No.

Q. Do you have any canceled checks or anything like that to show that you ever paid Nicholas Gray any wages?

A. He received a salary per the agreement of 600 a week, same as Julian. I don't know if he took a check or cash.

Q. Tell me how that salary was supposed to work. How many hours a week was he supposed to work?

A. There was no set hours.

Q. How many days a week was the club supposed to be open?

A. Anywhere from two to four.

Q. Okay.

A. It varied.

Q. If Nick said, "I'm only going to be open one day this week," would he have still gotten his full 600?

A. Yes.

Q. Okay. So the deal was $600 regardless of how much or how little he worked?

A. That's correct.

Q. Who set his salary?



7223ce04-14c0-46e5-84c1-5b4d5b5a864e

A. I mean, Steve talked to him and asked him to be the manager; so, I mean, I guess they talked about it.
Q. Did you approve the $600?
A. We all -- the officers talked about the agreement before we gave it to Nick.
Q. Okay. So you had input into Exhibit 1 before it was given to Nick Gray?
A. I reviewed that before Nick was in it. We all did.
Q. Right. Why did you review it?
A. Steve sent it to me and said, "Look it over."
Q. Okay. I'm guessing that's Steve's signature. Right?
A. That's correct.
Q. I notice that this version, the version that's attached to your answer, is dated 3-7 of '08. Do you see that?
A. That's correct.
Q. And so this agreement would have been entered into after Nick had become manager. Right?
A. That's true. Well, written. You know, we had a verbal understanding, I'm sure; but, like I said, it wasn't a formal corporation with everything above board.
Q. Right. Didn't have an employee handbook.
A. No.
Q. Didn't have --

show up. Right?
A. If they want to, yes.
Q. Right. And what happens if they don't show up?
A. Nothing.
Q. Okay. Who tells them when they can go home?
A. I don't know.
Q. Is it your understanding that somebody at Pasha can show up, work an hour and say, "Well, I've made enough tips so I'm leaving"?
A. Yes.
Q. That's your understanding?
A. That's my understanding, yeah.
Q. Okay. How long have you had that understanding?
A. From the beginning.
Q. Were you surprised that that business didn't do well with that business model?
A. That had nothing to do with the place not doing well.
Q. Employees coming and going as they see fit or workers coming and going as they see fit didn't have anything to do with it?
A. No.
Q. Okay. Why is that?
A. It was poor location and poor promotions that failed that business and, in the end, internal demise.
Q. What's that mean?

A. I mean, there was a major theft, resulting in the immediate closure of the club.
Q. Okay. What was the major theft?
A. Nick entered the club on a Sunday night when it was closed, took all the cash out of the safe, gave it to some stranger he just met so he could pay some stripper for sex.
Q. Uh-huh.
A. They started running his credit card to get the money back. The credit card put the account on fraudulent behavior, ceased all incoming -- seized all incoming funds that were due the club. The club had no money in the safe, no money coming in.
Q. Uh-huh.
A. And no officer was going to make an excess capital contribution to keep the place open.
Q. So you guys elected not to make an excess capital contribution. Right?
A. We'd had enough of the drama.
Q. All right. And that is what shut the business down. Right?
A. That action shut the business down, yes.
Q. Had you ever made an excess capital contribution?
A. Like I said before, maybe the first month, but -- I'd have to look. But I was pretty set from the beginning, if it doesn't make it, I'm done.